CLERK'S OFFICE
A TRUE COPY
May 06, 2024
s/ Mariah Kauder
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin



AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means

❑ Original     ❑ Duplicate

# UNITED STATES DISTRICT COURT
for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>information associated with Facebook user ID<br>#100006406997316, under the username "Mariano<br>Bylug;" (See Attachments) | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.  24-M-397 (SCD)

**Matter No.: 2024R00122**

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:       Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the ___Eastern___ District of ___Wisconsin___
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before ___5-20-24___     *(not to exceed 14 days)*
❑ in the daytime 6:00 a.m. to 10:00 p.m.     ☒ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to ___Honorable Stephen C. Dries___.
*(United States Magistrate Judge)*

❑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❑ for _____ days *(not to exceed 30)*     ❑ until, the facts justifying, the later specific date of _____.

Date and time issued:     ___5-6-24. 12:55 pm___

___Stephen C. Dri___
*Judge's signature*

City and state:       ___Milwaukee, Wisconsin___     ___Hon. Stephen C. Dries, U.S. Magistrate Judge___
*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with **Facebook user ID #100006406997316, under the username "Mariano Bylug," https://www.facebook.com/profile.php?id=100006406997316**, which is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a company headquartered in Menlo Park, California.

## ATTACHMENT B

### Particular Things to be Seized

**I.      Information to be disclosed by Meta Platforms, Inc. ("Meta")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta, including any messages, records, files, logs, or information that have been deleted but are still available to Meta, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)     All contact and personal identifying information, including: full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers;

(b)     All activity logs for the account and all other documents showing the user's posts and other Facebook activities from January 1, 2022 to the present;

(c)     All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them from January 1, 2022 to the present, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)     All profile information; News Feed information; status updates; links to videos, photographs, articles and other such items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)     All other records and contents of communications and messages made or received by the user from January 1, 2022 to the present, including all private messages, chat history, video calling history, and pending "Friend" requests;

(f)     All "check ins" and other location information;

(g)     All IP logs, including all records of the IP addresses that logged into the account;

(h) All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked;"

(i) All information about the Facebook pages that the account is or was a "fan" of;

(j) All past and present lists of friends created by the account;

(k) All records of Facebook searches performed by the account from January 1, 2022 to the present;

(l) All information about the user's access and use of Facebook Marketplace;

(m) The types of service utilized by the user;

(n) The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(o) All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(p) All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Meta is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

## II. Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence, or instrumentalities of, or contraband from, violations of Title 18, United States Code, Sections 933; 922(d)(1); and Title 21, United States Code, Sections 841 and 846, involving GARCIA since January 1, 2022, including, for each user ID identified on Attachment A, information pertaining to the following matters:

(a) The possession and/or sale of illegal narcotics;

(b) The possession of firearms/machineguns;

2

(c) Evidence of illegal firearms trafficking;

(d) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(e) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(f) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s); and

(g) The identity of the person(s) who communicated with the user ID about matters relating to the sale or purchase of illegal narcotics and firearms and/or machineguns, including records that help reveal their whereabouts.

3



**CLERK'S OFFICE**
**A TRUE COPY**
May 06, 2024
s/ Mariah Kauder
**Deputy Clerk, U.S. District Court**
**Eastern District of Wisconsin**

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of <br> *(Briefly describe the property to be searched <br> or identify the person by name and address)* <br><br> information associated with Facebook user ID <br> #100006406997316, under the username "Mariano <br> Bylug;" (See Attachments) | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

Case No. 24-M-397 (SCD)

**Matter No.: 2024R00122**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Eastern _____ District of _____ Wisconsin _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 933; 922(d)(1); 21 <br> U.S.C. § 841(a)(1); and 846 | Trafficking in Firearms; Knowingly Providing a Firearm to a Convicted Felon; <br> Manufacturing/Distributing/Dispensing a Controlled Substance; Conspiracy; |

The application is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Brendan Mulvey*
*Applicant's signature*

SA Brendan Mulvey, ATF
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ Telephone _____ *(specify reliable electronic means).*

Date: _____ 5-6-24 _____

*Judge's signature*

City and state: Milwaukee, Wisconsin

Hon. Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

I, Brendan Mulvey, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook account that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. ("Meta"), a company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Meta to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the account.

2.      I am a Special Agent in the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) and have been so employed since June 2018. I am presently assigned to the ATF Milwaukee IV Field Office in Milwaukee, Wisconsin. I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516. I was trained as an ATF Special Agent at the Federal Law Enforcement Training Center in Glynco, Georgia.

3.      Based on my training, experience, discussions with other law enforcement agents, and my participation in other investigations involving controlled substances, and firearms, I know that individuals involved with and/or associated to drug and firearms trafficking commonly use the social media platform Facebook to facilitate their drug and firearm trafficking activities. Like

most everyone else in this day and age, drug and firearm traffickers typically have a Facebook profile and are able to access it via their computer or cellular telephone. Drug and firearm traffickers commonly maintain a Facebook profile, and sometimes allow other drug and firearm trafficking associates to use their profile, to conduct criminal gang activity and/or drug and firearm trafficking business.

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents/law enforcement officers, and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Trafficking in Firearms, in violation of Title 18 United States Code, Section 933; Knowingly Providing a Firearm to a Convicted Felon, in violation of Title 18 United States Code(s), Section 922(d)(1); Manufacturing/Distributing/Dispensing a Controlled Substance, in violation of Title 21 United States Code(s), Section 841(a)(1); and Conspiracy to Distribute a Controlled Substance, in violation of Title 21 United States Code(s), Section 846 have been committed by Miguel GARCIA ("GARCIA" herein), and others, known and unknown, as explained below. There is also probable cause to search the information described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

## TARGET ACCOUNT

6. Facebook user ID #100006406997316, under the username "Mariano Bylug," https://www.facebook.com/profile.php?id=100006406997316.

2

**PROBABLE CAUSE**

7.     In February 2024, the Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF) initiated an investigation into Miguel Angel GARCIA, regarding illegal firearms and narcotics trafficking.   Prior to initiating the investigation, your affiant received information from a confidential source of information (CS) that GARCIA, also known as "BONES," was an alleged member/leader of the armed drug trafficking organization (ADTO) "Renegade Latin Kings" in/about Racine, WI. The "Renegade Latin Kings" are a reported subset of the larger Latin King street gang organization. The CS also identified a Facebook account used by to GARCIA with display name "Mariano Bylug," bearing account user ID: 100006406997316, and URL: https://www.facebook.com/profile.php?id=100006406997316. Your affiant reviewed publicly viewable information on the account and identified numerous images of a Hispanic male whom your affiant recognized as GARCIA based upon a comparison to his Wisconsin (WI) Department of Transportation (DOT) issued driver's license image.

**Background[1]**

8.     On Friday, February 23, 2024, ATF was contacted and advised that Kenosha Drug Operations Group (KDOG) had an on-going investigation into GARCIA and were intending to purchase a firearm and narcotics from him later that same day. Det. Becker related that he had received information from an independent confidential informant (CI) that GARCIA was a member of the ADTO "Renegade Latin Kings," which corroborated information previously

---

1.     In the controlled buys described herein, law enforcement met with the CI at an undisclosed location and conducted a search of their person and vehicle to ensure they were not in possession of any contraband/firearm and narcotics, or currency. After searching for contraband, and finding nothing, law enforcement provided the CI with a body-worn recording device and pre-recorded law enforcement funds.  Law enforcement then escorted/trailed the CI in their vehicle directly to the meet location.  Following the transaction, Det. Becker then trailed/escorted the CI to an undisclosed location and took possession of the contraband. Det. Becker/the affiant then performed a search the CI's person and vehicle and ensured they were not in possession of any additional contraband/firearms and narcotics, or currency.

received by your affiant. Your affiant then agreed to assist KDOG in the controlled purchase operation. The following is a summation of KDOG's investigation leading up to ATF's involvement.

9.      It is important to note that the CI has been a reliable source of information throughout the course of ATF's investigation, as well numerous additional state investigations. Information provided by the CI has been independently corroborated by unrelated sources of information, as well as through follow up investigation by investigating law enforcement officers. The CI was originally working for consideration for a criminal traffic offense in the state of Wisconsin but has since satisfied the requirements for consideration and is currently a paid informant within the state. The CI has also since been signed up as an informant for the ATF and is receiving subsistence payments in return for his efforts in aiding law enforcement.   CI had firsthand opportunity to observe the events described herein.  CI has convictions for disorderly conduct, domestic abuse, and misdemeanor battery; criminal damage to property; strangulation and suffocation, domestic battery; bail jumping; resisting or obstructing; and operating while revoked.

10.      The CI identified GARCIA via the Facebook account, "**Mariano Bylug**."  Acting under the direction and control of law enforcement, the CI then made contact with GARCIA via Facebook messenger at **Mariano Bylug** and inquired regarding the purchase of powder cocaine. GARCIA responded to the CI by providing a telephone number of (414) 791-1317.

**February 9 Controlled Buy[2]**

11.      On February 9, 2024, the CI, acting under the direction and control of law enforcement, purchased two eight-balls of cocaine from GARCIA. Your affiant is aware from his

---

2        In all controlled buys described herein, law enforcement met with the CI at an undisclosed location and conducted a search of their person and vehicle to ensure they were not in possession of any contraband/firearm and

4

training, knowledge, and experience regarding narcotics investigations that an "eight-ball" is a term used to describe approximately 3.5 grams of narcotics.

12.     Prior to the operation, the CI contacted GARCIA via text message and inquired regarding the price for an eight-ball and a half ounce of cocaine. GARCIA responded, stating that it was $160 for an eight-ball, $600 for a half ounce, and $1,000 for a whole ounce. The CI advised they were looking for two eight-balls (7 grams) and asked if they could meet around 1130 and 1200 hours that same day. GARCIA advised that it would be $300 for the two eight-balls of cocaine and agreed to meet the CS at approximately 1130 hours. GARCIA then instructed the CI to meet him at the McDonald's, located at 1820 30th Ave., Kenosha, WI 53144. GARCIA advised the CI that he would be driving a work truck.

13.     At approximately 1114 hours, surveillance units observed a white Dodge pickup truck, bearing WI registration plate TH1229, with an extended truck bed, and black colored metal rack covering the rear window ("Suspect Vehicle-1" herein), enter the Walgreens parking lot, located at 1810 30th Ave., Kenosha, WI 53144, which neighbors the McDonald's to the north. According to records from the Wisconsin Department of Transportation, the Wisconsin license plate TH1229 is registered to J. Guadalipe Aranda.

14.     The CI then arrived at approximately 1118 hours and parked alongside Suspect Vehicle-1 inside the Walgreens parking lot. Once parked, the CI exited their vehicle and entered the front passenger seat of Suspect Vehicle-1 and GARCIA handed the CI a sandwich bag containing a white powdery substance of suspected cocaine. The CI then provided GARCIA the

---

narcotics, or currency. After searching for contraband, and finding nothing, law enforcement provided the CI with a body-worn recording device and pre-recorded law enforcement funds. Law enforcement then escorted/trailed the CI in their vehicle directly to the meet location. Following the transaction, Det. Becker/the affiant then trailed/escorted the CI to an undisclosed location and took possession of the contraband. Det. Becker/the affiant then performed a search the CI's person and vehicle and ensured they were not in possession of any additional contraband/firearms and narcotics, or currency.

pre-recorded law enforcement funds in exchange. GARCIA then began explaining to the CI the act of breaking down a larger quantity of cocaine into smaller amounts for distribution. For instance, GARCIA stated to the effect, "It's brittle. When you break it down… When I first get it, you going to get like bigger chunks. As I break into it, and break them chunks down, it's brittle. It just starts breaking away."

15.     During the meeting, the CI indicated that they were a convicted felon and in need of a firearm. GARCIA explained that he purchases his firearms from Dunham's Sports and "the auction" off Durand Ave., which your affiant recognized to be the Sturtevant Gun Show, which is held at the Fountain Banquet Hall, located at 8505 Durand Ave., Sturtevant, WI 53177.

16.     The CI also inquired with GARCIA regarding the purchase of Percocet pills. GARCIA responded that "Lil Tone" sells Percocet pills. GARCIA then described "Lil Tone" as having "Fuck Love" tattooed over his eyebrow. Your affiant recognized the individual described to correspond to Antonio BANE, a known member of the "Renegade Latin Kings" ADTO.

17.     Det. Becker later weighed and field tested the suspected narcotics, which rendered a presumptive positive result for the presence of cocaine, and an approximate weight of 8.2 grams.

**February 19 Controlled Buy**

18.     Continuing on February 19, 2024, Det. Becker organized a controlled purchase for a half-ounce of cocaine from GARCIA utilizing the CI. The CI contacted GARCIA via text message at the previously provided telephone number and inquired regarding the purchase of a

6

half-ounce of cocaine. The CI then arranged to meet with GARCIA at Walgreens, located at 1810 30th Ave., Kenosha, WI 53144, at approximately 1200 hours to purchase the cocaine.

19. At approximately 1243 hours, surveillance units observed a gray Volkswagen Jetta bearing Illinois (IL) registration plate FP170323 ("Suspect Vehicle-2" herein) arrive in the Walgreens parking lot and park alongside the CI vehicle. A Hispanic male, recognized as GARCIA, then exited the driver's seat and began approaching the CI vehicle. Surveillance units then temporarily lost sight of GARCIA as he neared the CI vehicle.

20. At approximately 1244 hours, GARCIA was observed returning to Suspect Vehicle-2 and entering the driver's seat. GARCIA then exited the parking lot and travelled southbound on 30th Ave. Surveillance units then followed GARCIA away from the location and observed him travel to 2120 87th Place, Kenosha, WI 53143. Upon arrival, units observed GARCIA exit the driver's seat of Suspect Vehicle-2 and an additional unknown Hispanic male exit the front passenger seat. The two then met with an unknown black female in front of 2120 87th Pl. At approximately 1310 hours, GARCIA and the unknown Hispanic male returned Suspect Vehicle-2. Suspect Vehicle-2 then departed the location and out of view of surveillance units.

21. Det. Becker later weighed and field tested the suspected cocaine which rendered a presumptive positive result for the presence of cocaine and an approximate weight of 15.3 grams.

**Controlled Buy on February 23, 2024**

22. On February 23, 2024, KDOG, with the assistance of ATF, organized a controlled purchase of a handgun and a half-ounce of cocaine from GARCIA utilizing the CI. Prior to the

7

operation, the CI received confirmation from GARCIA that he had a handgun and was willing to sell it to the CI.

23. At approximately 1510 hours, the CI engaged in a telephone contact with GARCIA who advised that he would be there in approximately ten [10] minutes and that he would be driving a truck. At approximately 1546 hours, surveillance units observed Suspect Vehicle-1 travelling southbound through the Walgreens parking lot located at 1810 30th Ave., Kenosha, WI 53144. Suspect Vehicle-1 then continued into the McDonalds parking lot, located just south of Walgreens at 1820 30th Ave., Kenosha, WI 53144. Suspect Vehicle-1 was then observed crossing 30th Ave. and entering the "Pick n' Save" parking lot via the southwest entry point. Suspect Vehicle-1 then continued northbound through the lot before parking alongside the CI vehicle.

24. At approximately 1549 hours, a Hispanic male wearing a baseball cap, gray jacket, blue shirt, and blue jeans, recognized to be GARCIA, exited the driver's seat of Suspect Vehicle-1 and then approached and entered the front passenger seat of the CI vehicle. Upon entering the vehicle, GARCIA is observed holding a white/tan in color glove, used to conceal a Jennings, model J-22, .22 caliber pistol bearing serial number 752488 ("the Jennings" herein), a plastic baggie containing .22 caliber ammunition, and a plastic baggie containing a white powdery substance of suspected cocaine. GARCIA then provided the glove to the CI out of view of the recording device. GARCIA is then heard stating the effect, "It's all there, bro. Everything. You want to look at it real quick, or what? Go ahead." GARCIA then shut the passenger-side door of the CI vehicle and began looking around interior of the vehicle as if to be inspecting for electronic surveillance equipment. The CI can then be heard stating, "That's nice. That mother fucker nice," in reference the Jennings. GARCIA the responds to the effect, "Just a little pocket monster." GARCIA and the

8

CI then exchange goodbyes and GARCIA begins exiting the CI vehicle. As GARCIA is exiting, he advises the CI, "Be smooth."

25. GARCIA was then observed returning and re-entered the driver's seat of Suspect Vehicle-1. Suspect Vehicle-1 then backed out and began travelling southbound through the parking lot. Suspect Vehicle-1 then turned eastbound in the lot and began travelling towards 27th Ave. Suspect Vehicle-1 then turned northbound onto 27th Ave. before then turning eastbound onto 18th St. Suspect Vehicle-1 then continued eastbound on 18th St. before then turning south/eastbound on Birch Rd. Suspect Vehicle-1 then turned northbound onto Sheridan Rd.

26. Units then surveilled Suspect Vehicle-1 for several miles as it continued northbound on Sheridan Rd. and into Racine, WI. Surveillance units eventually lost sight of Suspect Vehicle-1 as it entered Racine. While surveilling Suspect Vehicle-1, units observed Suspect Vehicle-2 being driven by an unidentified female who was also travelling northbound on Sheridan Rd., in a manner as if she was trailing Suspect Vehicle-1. Your affiant is aware from training, knowledge, and experience that individuals engaged in the illegal distribution of firearms/narcotics will often employ other suspects to act as counter surveillance/look out in an effort to identify and avoid the detection of law enforcement. Units then began to follow Suspect Vehicle-2 as it continued northbound on Sheridan Rd. Units continued to surveil Suspect Vehicle-2 until it eventually travelled to "Save A Lot", located at 1500 State St., Racine, WI 53404. Units then terminated surveillance shortly thereafter.

27. Immediately following the transaction, Det. Becker escorted/trailed the CI to an undisclosed location where he collected the Jennings, the plastic bag containing a box of .22 caliber ammunition, as well as the plastic bag containing the suspected cocaine, which had just been purchased from GARCIA. The Jennings was then rendered safe and observed to contain a

9

magazine holding five rounds of .22 caliber ammunition, with no round in the chamber. The suspected narcotics were later weighed and field tested which rendered a presumptive positive result for the presence of cocaine, with an approximate weight of 11.3 grams.

**Controlled Buy on March 1, 2024**

28.     On March 1, 2024, ATF, along with investigators from KDOG, organized a controlled purchase of a firearm and cocaine from GARCIA utilizing the CI.  Leading up to the operation and acting under the direction and control of law enforcement, the CI engaged in text message conversations with GARCIA in which GARCIA offered to sell them a Taurus brand firearm for $750.00 USC, along with 7 grams of cocaine for $300.00 USC. GARCIA also indicated that he had the cocaine with him at "the spot" but would have to retrieve the firearm from an unspecified location in Kenosha, WI. The CI then arranged to meet with GARCIA in the Texas Roadhouse parking lot, located at 6228 Durand Avenue, Mount Pleasant, WI 53406.

29.     At approximately 1425 hours, GARCIA advised the CI he would meet them in about an hour. At approximately 1513 hours, surveillance observed a white/Hispanic female, wearing a cream-colored jogging/workout outfit exit the suspect residence and enter the driver's seat of Suspect Vehicle-2. The female then departed the location in the suspect vehicle travelling eastbound on Olive St. At approximately 1520 hours, Det. Becker then escorted/trailed the CI vehicle directly to the Texas Roadhouse, where the CI took position within the parking lot.

30.     At approximately 1543 hours, surveillance observed Suspect Vehicle-2 return travelling westbound on Olive St. and park in the driveway of the suspect residence. Surveillance then observed the aforementioned female exit the vehicles driver's seat and an additional white/Hispanic male wearing a ball cap, gray jacket and dark colored pants, believed to be

GARCIA, exit the front passenger seat. Both subjects were then observed entering the suspect residence.

31.     At approximately 1604 hours, surveillance observed GARCIA and the female exit the front door of the suspect residence and approach Suspect Vehicle-2. GARCIA then entered the vehicles driver's seat while the female entered the front passenger seat. The vehicle then backed out of the driveway and departed eastbound on Olive Street.  At approximately 1607 hours, GARCIA contacted the CI asking if they could meet near Kenosha to conduct the exchange, indicating that GARCIA was likely travelling to Kenosha to retrieve the firearm/contraband. GARCIA and the CI then agreed to meet at the original location at Texas Roadhouse.

32.     At approximately 1706 hours, your affiant observed the Suspect Vehicle-2 driving through the strip mall parking lot just east of Texas Roadhouse near the U.S. Cellular store, located at 2860 S. Green Bay Rd., Racine, WI 53406. Your affiant observed the vehicle to be occupied by a male driver, believed to be GARCIA, and a female front seat passenger. Additional surveillance units then observed the suspect vehicle park in the east side of the parking lot near the U.S. Cellular. Surveillance then observed a Hispanic male, wearing a ball cap, gray jacket, and dark colored pants exit the vehicles driver's seat while speaking on his cell phone. Surveillance unit positively identified the subject to be GARCIA.

33.     Suspect Vehicle-2 then exited the lot travelling westbound towards Texas Roadhouse. Suspect Vehicle-2 was then observed parking alongside the CI vehicle inside the lot. GARCIA then exited the suspect vehicle and entered the front passenger seat of the CI vehicle. At approximately 1711 hours, GARCIA exited the CI vehicle and returned to Suspect Vehicle-2 and re-entered the driver's seat. Suspect Vehicle-2 then backed out and began departing the location, exiting the lot through the east-side entry/access point. Suspect Vehicle-2 then continued

11

eastbound before then turning northbound onto the service road east of the Pick n' Save lot. Surveillance units then lost sight of Suspect Vehicle-2.

34. At approximately 1721 hours, surveillance observed the suspect vehicle travelling eastbound on Olive St. before parking in the driveway of the suspect residence. GARCIA then exited the driver's seat of the vehicle, and the aforementioned female exited the front passenger seat. Both subjects were then observed entering the front door of the suspect residence. As part of this investigation, your affiant queried the estimated time of travel from Texas Roadhouse to the suspect residence. Your affiant observed it to take an estimated nine minutes to drive between each location. Your affiant observed GARCIA's time of arrival to be consistent with him driving directly from Texas Roadhouse to the suspect residence.

35. Immediately following the transaction, Det. Becker then escorted/trailed the CI directly to an undisclosed location where he collected a Taurus, model G2C, 9mm caliber pistol bearing serial number ADG531924 ("the Taurus" herein)., and a clear plastic baggie containing a white powdery substance suspected to be cocaine, which had just been purchased from GARCIA. The Taurus was then rendered safe and observed to contain a magazine holding nine rounds of 9mm caliber ammunition, with no round in the chamber. The suspected narcotics were also subsequently weighed and field tested, which rendered a presumptive positive result for the presence of cocaine and an approximate weight of 10.5 grams.

**Controlled Buy on March 11, 2024**

36. On March 11, 2024, the ATF, along with investigators from KDOG and the Milwaukee Police Department (MPD), organized a controlled purchase of a firearm and cocaine from GARCIA utilizing the CI. Leading up to the operation and acting under the direction and control of law enforcement, the CI engaged in text message and telephone conversations with

12

GARCIA in which GARCIA offered to sell them a .22 caliber rifle with an attached silencer for $800.00 USC and 7 grams of cocaine. The CI also indicated that during the conversations, GARCIA also offered to sell them a privately made firearm (PMF) with an affixed automatic conversion device for $1,000.00 USC.

37. During a text message conversation on Wednesday, March 6, 2024, while discussing the sale/purchase of firearms/narcotics, the CI requested GARCIA send them an image of himself holding the advertised .22 caliber rifle with affixed silencer. GARCIA then sent the CI an image identifying himself in possession of the rifle along with two additional subjects also in possession of firearms. GARCIA then sent a message reading, "Delete thats me n some brathas." GARCIA and the CI subsequently arranged to meet on Monday, March 11, 2024, to conduct the transaction.

38. On the date of the operation, the CI contacted GARCIA to confirm that they were still meeting later that day. GARCIA agreed to meet with the CI to sell them the .22 caliber rifle and 7 grams of cocaine but stated that he was not currently in possession of the PMF handgun and would have to retrieve it from one of his associates. GARCIA indicated that he was attempting to contact his associate in order to obtain the firearm to sell to the CI.

39. Prior to the deal, at approximately 1300 hours, the CI made a telephone call to GARCIA during which GARCIA stated he would not be able to sell the PMF handgun but offered to sell the CI the .22 caliber rifle and 14 grams of cocaine. The CI indicated that they would save the money for when GARCIA had the PMF but was still interested in purchasing the rifle and

originally agreed upon 7 grams of cocaine. The CI subsequently arranged to meet with GARCIA in the parking lot of Sportsman's Warehouse, located at 2710 S. Green Bay Rd., Racine, WI 53406.

40. At approximately 1235 hours, surveillance observed GARCIA exit the suspect residence with an additional unknown Hispanic male and enter a white Volkswagen Sports Utility Vehicle (SUV) bearing Ohio (OH) registration plate JBK5149 ("Suspect Vehicle-3" herein). Surveillance units described the unknown Hispanic male as approximately 5'05" tall, with a slender build, and wearing a flat brim multi-colored dark ball cap. A check of the vehicle's registration revealed it to be registered to EAN Holdings LLC., at 8249 Mohawk Dr., Strongsville, OH 44136. Suspect Vehicle-3 then departed the suspect residence and was observed to travel south/west bound on Taylor Ave. Suspect Vehicle-3 made a left-hand turn onto Wood Rd. and continued southbound. Surveillance noted the suspect vehicle to be travelling in the direction towards Kenosha, WI. Units then discontinued the surveillance shortly thereafter.

41. At approximately 1338 hours, Det. Becker and Det. Swanson then escorted/trailed the CI vehicle directly to Sportsman's Warehouse where the CI took position within the parking lot. At approximately 1410 hours, Suspect Vehicle-3 was observed arriving and parking alongside the CI vehicle. Your affiant then observed GARCIA exit Suspect Vehicle-3 wearing a black jacket and white shorts and retrieve a cardboard box later determined to contain a German Sports Guns, model GSG-16, .22 caliber rifle bearing serial number B147142 ("the GSG-16" herein). GARCIA then opened the rear passenger side door of the CI vehicle as if to place the box containing the firearm in the rear passenger compartment. As this was happening, the CI exited the vehicle and then opened the trunk for GARCIA to place the firearm inside. GARCIA then closed the rear passenger side door of the CI vehicle and placed the box containing the GSG-16 inside the trunk

14

of the CI vehicle. The CI then returned to the driver's seat of the CI vehicle and GARCIA entered the front passenger seat.

42.     Upon entering the vehicle, the CI questioned GARCIA regarding the PMF handgun with affixed automatic selector switch. GARCIA stated that the firearm belonged to his associate who was not wanting to sell it at that time, but GARCIA believed he eventually would. Before exiting the vehicle, GARCIA advised the CI that if they later decide to sell the GSG-16, to let him know and he'll purchase it back from them.

43.     As GARCIA was exiting the vehicle, the CI asked GARCIA whether he was "naked" since selling them the Taurus handgun. Your affiant is aware that "naked" is street vernacular used to refer to when someone is not armed with a firearm. GARCIA then responded by stating, "Hell no." The CI later indicated that GARCIA then gestured/indicated towards his hip as if he was preparing to expose a firearm. GARCIA then closed the front passenger door of the CI vehicle and re-entered the driver's seat of the suspect vehicle.

44.     Surveillance units then observed Suspect Vehicle-3 back out begin departing the parking lot of the Sportsman's Warehouse. Units then surveilled Suspect Vehicle-3 as it travelled directly back to the suspect residence where it was observed parking in the driveway. GARCIA then exited the driver's seat of Suspect Vehicle-3 and then approached and entered the front door of the suspect residence.

45.     Immediately following the transaction, Det. Becker and Det. Swanson escorted/trailed the CI vehicle directly to an undisclosed location where they collected the box containing the GSG-16, and a clear plastic baggie containing a white powdery substance suspected to be cocaine, which had just been purchased from GARCIA. The GSG-16 was rendered safe and observed to contain no magazine and no round inside the chamber. Also located inside the box

15

was a magazine containing twenty-one rounds of .22 caliber ammunition. The suspected narcotics were later weighed and field tested which rendered a presumptive positive result for the presence of cocaine and an approximate weight of 7.9 grams.

**Controlled Buy on March 20, 2024**

46. On March 20, 2024, ATF, along with KDOG Det. Becker, organized a controlled purchase of a firearm and narcotics from GARCIA utilizing the CI.

47. Prior to the operation, the CI engaged in text message and telephone conversations with GARCIA at telephone number (414) 791-1317 in which GARCIA offered to sell them a 5.56 caliber rifle. Specifically, on Monday, March 18, 2024, GARCIA texted the CI images of a Springfield Armory, model Saint Victor, AR-style rifle along with a magazine containing ammunition. GARCIA indicated that the firearm belonged to an associate of his and offered to sell it to the CI for $1,200. GARCIA later modified the offer by reducing the price to $1,100 and indicated that he also offered to sell the firearm to other unknown associates. At the direction of your affiant, the CI then offered to purchase the firearm for the previously proposed price of $1,200 if GARCIA agreed to hold onto the firearm for the CI. The CI then arranged to purchase the firearm and a half-ounce of cocaine from GARCIA on Wednesday, March 20, 2024.

48. Continuing on Tuesday, March 19, 2024, at approximately 2230 hours, your affiant directed the CI to contact GARICA and request to purchase the previously discussed firearm/narcotics. GARCIA then indicated that he could sell the items to CI at that time and directed them to 5932 Margery Dr., Mount Pleasant, WI 53406. The CI then indicated that they

16

were unable meet at that time, and stated they would meet GARCIA on Wednesday, March 20, 2024.

49.     On Wednesday, March 20, 2024, at approximately 0906 hours, the CI received a text message from GARCIA asking what time they would like to meet. The CI then agreed to meet with GARCIA at 1300 hours later that same day. Prior to the deal, at approximately 1220 hours, and acting under the direction and control of law enforcement, the CI contacted GARCIA and indicated that they'd be ready soon. The CI also inquired whether he could purchase an ounce of cocaine. GARCIA then agreed to sell the CI an ounce of cocaine for $1,200. The CI and GARCIA then agreed to meet at 5932 Margery Dr., Mount Pleasant, WI 53406.

50.     Det. Becker then escorted/trailed the CI directly to the area of 5932 Margery Dr. where they were observed by surveillance units arriving and parking behind a semi-truck in front of the meet location. At approximately 1306 hours, the CI received a telephone call from GARCIA who advised that he would be there in approximately ten to fifteen minutes. GARCIA also stated, "I'm going to stop and grab that shit real quick," possibly referring to the firearm and/or cocaine.

51.     At approximately 1338 hours, a gray Dodge Durango with a trailer affixed to the rear hauling what appeared to be yard waste ("Suspect Vehicle-4" herein) was observed driving westbound on Olive St. before parking in the driveway of a white detached garage neighboring the suspect residence to the east. A male wearing a ball cap, gray jacket, necklace, and blue jeans, believed to be GARCIA, was then observed exiting the front passenger seat of Suspect Vehicle-4 and approach and enter the front door of the suspect residence. Moments later the male then exited

17

the residence and entered the front passenger seat of Suspect Vehicle-4. The vehicle then departed the residence travelling westbound on Olive St.

52. At approximately 1341 hours, the CI received a text message from GARCIA indicating that he was approximately five minutes away. At approximately 1344 hours, Suspect Vehicle-4 was observed arriving and parking in the rear parking lot of 5932 Margery Dr. along the detached garages facing eastbound. At approximately the same time GARCIA sent the CI a text message directing them to meet him in the rear parking lot.

53. At the direction of law enforcement, the CI then repositioned to the rear parking lot of 5932 Margery Dr. and parked in a parking stall facing the building (south). Surveillance units then observed a male, later identified by the CI as GARCIA, exit the suspect vehicle and walk towards the building and out of view. At approximately 1345 hours, a male matching GARCIA's description was observed walking around towards the front of 5932 Margery Dr.

54. At approximately 1348 hours, units observed GARCIA return from the building and re-enter Suspect Vehicle-4. Surveillance units were not able to observe any objects in GARCIA's hands. Moments later, GARCIA exited the front passenger seat of the Suspect Vehicle-4 holding what appeared to be a small white box or bag. GARCIA was then observed approaching the CI vehicle and entering the front passenger seat.

55. Upon entering the CI vehicle, GARCIA was observed leaning across the CI while attempting to remove the firearm which was concealed inside his pant leg. GARIA then placed the firearm, later determined to be a Springfield Armory, model Saint Victor, multi-caliber rifle bearing serial number 406558 ("the Springfield" herein), along the center console in the front passenger compartment. GARCIA then handed the CI a white plastic grocery bag later observed to contain a firearm magazine loaded with twenty rounds of .223 caliber ammunition and a clear

18

plastic baggie containing a white powdery substance suspected to be cocaine. The CI also provided GARCIA the pre-recorded ATF funds in exchange for the firearm and cocaine.

56. The CI then engaged GARCIA in conversation regarding the future purchase of three and a half ounces of cocaine. GARCIA indicated that he could sell the CI three and a half ounces of cocaine for $3,000. The CI also inquired with GARCIA regarding the previously discussed PMF handgun with affixed auto sear. GARCIA stated that his associate was not willing to sell the firearm at that time. The CI and GARCIA then exchanged goodbyes and GARCIA exited the CI vehicle.

57. GARCIA was then observed returning to Suspect Vehicle-4, re-entering the front passenger seat. Suspect Vehicle-4 was then observed departing the lot and travelling eastbound on Margery Dr.

58. Suspect Vehicle-4 was then surveilled several miles as it travelled south before eventually arriving at 1319 79th St., Kenosha, WI 53143. Suspect Vehicle was observed to have an affixed WI registration plate bearing AJJ7568. A query of the vehicle through the WI DOT revealed it to be dual registered to John Richard MARTIN, at 2510 48th St., Kenosha, WI 53140, and Eva Marie Bellcom, at 5303 37th Avenue, Kenosha, WI 53144. The surveillance was terminated shortly thereafter.

59. Immediately following the transaction, your affiant escorted/trailed the CI vehicle directly to an undisclosed location where they were also met by Det. Becker. Investigators then collected the Springfield from the front passenger seat of the CI vehicle leaning against the center console which had just been purchased form GARCIA. The Springfield was rendered safe and observed to contain no magazine and no round inside the chamber. The white plastic grocery bag containing the firearm magazine loaded with .223 caliber ammunition and the clear plastic baggie

19

containing suspected cocaine, which had also just been purchased from GARCIA, was also collected from the area between the driver's seat and front passenger seat. The suspected narcotics were later weighed and field tested which rendered a presumptive positive result for the presence of cocaine and an approximate weight of 29.1 grams. Your affiant also collected $100 of pre-recorded ATF funds which had been returned to the CI by GARCIA during the transaction.

60. Your affiant and Det. Becker then debriefed the CI regarding what had occurred during the transaction. During the debrief, the CI stated that while waiting for GARCIA in the rear parking lot of 5932 Margery Dr., they observed a white male, approximately thirty years of age, approximately 5'09" tall, weighing approximately 180 lbs., with a red trimmed beard, and wearing a hat and what appeared to be tinted glasses/transition lenses exit the driver's seat of Suspect Vehicle-4 and began adjusting refuse/leaves located inside the trailer.

61. Following the deal, your affiant obtained a WI driver's license image of MARTIN and provided it to the CI for review. The CI subsequently identified MARTIN as the white male/operator of Suspect Vehicle-4 observed during the controlled purchase operation.

**Review of Cellphone Belonging to Taylor Gonzalez**

62. In May 2024, your affiant reviewed a digital extraction report for a cellular telephone believed to be used by Taylor Gonzalez, a suspected member of the Renegade Latin Kings and associate of GARCIA's. The cell phone bearing number (262) 455-5941was recovered by the Kenosha Police Department on April 21, 2023, during a residential search warrant at GONZALEZ's residence, 6810 23rd Avenue, Lower, Kenosha, WI 53143, as part of a narcotics-

20

related investigation. A forensic examination of the device was subsequently performed pursuant to a search warrant and its contents analyzed for electronically stored evidence.

63. While reviewing the device, your affiant located an exchange between GONZALEZ and contact name "B," at telephone number (224) 277-3461. According to law enforcement databases, the unofficial subscriber for (224) 277-3461 is GARCIA, and whose carrier/service provider is Verizon. Review of GONZALEZ's phone reveals evidence that he was involved in drug trafficking activities as far back as 2022.

64. For example, in a text message exchange that began on November 24, 2021 and continued through May 3, 2022, GARCIA and GONZALEZ discussed the sale of an unknown type of narcotics:

- GARCIA first asks GONZALEZ whether he is home, to which GONZALEZ states he is not and that is he at the bar. GARCIA then states, "O okay fs Wasup I need 7 wanna meet at the house or what I went out last night I was all fucked up." Based on their training and experience, and the investigation to date, case agents believe that GARCIA contacted GONZALEZ and to inquire regarding the purchase of 7 grams of narcotics.

- Later in the conversation, GARCIA states, "It's not that bro … Nation … It' been hit already". Based on the context of the messages, as well as your affiants training, knowledge, and experience regarding narcotics investigations, it is believed that "hit" is intended to indicate that the narcotics had been diluted (or "cut") with an additional substance. Your affiant is aware that narcotics traffickers will often "cut" their product by mixing it with additional substances so as to increase the quantity and/or to intensify/prolong the effects of the drug in an effort to enhance their profits. GARCIA also utilized the term "Nation," while discussing the quality of the narcotics with GONZALEZ. Your affiant is aware that "Nation" is an emphatic term utilized by gang members to assert the truth of their statements to each other. GARCIA then continued, "Yeah it fuckin melted on me I had a feelin should j left it shake but I did it at mas n melted it's not the same as last time … That other shit was good n cooked." Your affiant believes GARCIA is describing the process of "cooking"/manufacturing cocaine into crack cocaine. Your affiant also believes that GARCIA is indicating that the quality of the cocaine is not sufficient to convert into crack.

- GONZALEZ responded that his source of supply was insisting that the narcotics/cocaine came from the same batch that previously provided amounts had

21

been sourced from. GARCIA disagreed and stated, "Nooo … It's not it supper soft n Chuckie … Inside … So what he or who ever did CANT do nun to it u got to j leave it like it is". GARCIA also indicated that he was unable to cut the cocaine as a result of the quality being so poor. GARCIA described the narcotics as "moist" and stated that the previous amount(s) "wasn't that soft." GONZALEZ then agreed and stated, "Ya definitely not the same, not saying it horrible but that other one was 🔥." Based on their training and experience, and the investigation to date, case agents believe that GARCIA expressed displeasure with the quality of narcotics he received from GONZALEZ.

## BACKGROUND CONCERNING FACEBOOK

65.     Meta owns and operates Facebook, a free-access social networking website that can be accessed at http://www.facebook.com. Facebook users can use their accounts to share communications, news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

66.     Meta asks Facebook users to provide basic contact and personal identifying information either during the registration process or thereafter. This information may include the user's full name, birth date, gender, e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Each Facebook user is assigned a user identification number and can choose a username.

67.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

68. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

69. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

70. Facebook users can upload photos and videos to be posted on their Wall, included in chats, or for other purposes. Users can "tag" other users in a photo or video and can be tagged by others. When a user is tagged in a photo or video, he or she generally receives a notification of the tag and a link to see the photo or video.

71. Facebook users can use Facebook Messenger to communicate with other users via text, voice, video. Meta retains instant messages and certain other shared Messenger content

23

unless deleted by the user, and also retains transactional records related to voice and video chats. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

72. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

73. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

74. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

75. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

76. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

77. In addition to the applications described above, Meta provides users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

78.     Meta also retains records of which IP addresses were used by an account to log into or out of Facebook, as well as IP address used to take certain actions on the platform. For example, when a user uploads a photo, the user's IP address is retained by Meta along with a timestamp.

79.     Meta retains location information associated with Facebook users under some circumstances, such as if a user enables "Location History," "checks-in" to an event, or tags a post with a location.

80.     Social networking providers like Meta typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

81.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Meta, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged

25

photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Meta logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, location information retained by Meta may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

82. Therefore, the servers of Meta are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

83. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Meta to disclose to the government copies of the records and other information (including

26

the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

84.     Based on the foregoing, I request that the Court issue the proposed search warrant.

85.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Meta. Because the warrant will be served on Meta, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

86.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated."

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with **Facebook user ID #100006406997316, under the username "Mariano Bylug," https://www.facebook.com/profile.php?id=100006406997316**, which is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a company headquartered in Menlo Park, California.

<u>**ATTACHMENT B**</u>

**Particular Things to be Seized**

**I.     Information to be disclosed by Meta Platforms, Inc. ("Meta")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta, including any messages, records, files, logs, or information that have been deleted but are still available to Meta, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)     All contact and personal identifying information, including**:** full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers;

(b)     All activity logs for the account and all other documents showing the user's posts and other Facebook activities from January 1, 2022 to the present;

(c)     All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them from January 1, 2022 to the present, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)     All profile information; News Feed information; status updates; links to videos, photographs, articles and other such items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)     All other records and contents of communications and messages made or received by the user from January 1, 2022 to the present, including all private messages, chat history, video calling history, and pending "Friend" requests;

(f)     All "check ins" and other location information;

(g)     All IP logs, including all records of the IP addresses that logged into the account;

(h)  All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked;"

(i)  All information about the Facebook pages that the account is or was a "fan" of;

(j)  All past and present lists of friends created by the account;

(k)  All records of Facebook searches performed by the account from January 1, 2022 to the present;

(l)  All information about the user's access and use of Facebook Marketplace;

(m)  The types of service utilized by the user;

(n)  The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(o)  All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(p)  All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Meta is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

## II.  Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence, or instrumentalities of, or contraband from, violations of Title 18, United States Code, Sections 933; 922(d)(1); and Title 21, United States Code, Sections 841 and 846, involving GARCIA since January 1, 2022, including, for each user ID identified on Attachment A, information pertaining to the following matters:

(a) The possession and/or sale of illegal narcotics;

(b) The possession of firearms/machineguns;

2

(c) Evidence of illegal firearms trafficking;

(d) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(e) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(f) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s); and

(g) The identity of the person(s) who communicated with the user ID about matters relating to the sale or purchase of illegal narcotics and firearms and/or machineguns, including records that help reveal their whereabouts.

3

**CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)**

I, _____, attest, under penalties of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this declaration is true and correct. I am employed by Facebook, and my official title is _____. I am a custodian of records for Facebook. I state that each of the records attached hereto is the original record or a true duplicate of the original record in the custody of Facebook, and that I am the custodian of the attached records consisting of _____ (pages/CDs/kilobytes). I further state that:

a. all records attached to this certificate were made at or near the time of the occurrence of the matter set forth, by, or from information transmitted by, a person with knowledge of those matters;

b. such records were kept in the ordinary course of a regularly conducted business activity of Facebook; and

c. such records were made by Facebook as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal Rules of Evidence.

_____   _____
Date                                                          Signature

4